UNITED STATES of America

v.

Calvin L. TIDSWELL.

Crim. No. 90–00063–P.

United States District Court,
D. Maine.

Dec. 20, 1990.

Thimi R. Mina, Asst. U.S. Atty., Portland, Me., for plaintiff.

Steven D. Silin, Lewiston, Me., for defendant.

MEMORANDUM OF DECISION AND ORDER DENYING DEFENDANT'S MOTIONS TO SUPPRESS STATEMENTS AND PHYSICAL EVIDENCE

GENE CARTER, Chief Judge.

On October 18, 1990 a federal grand jury returned an indictment against Defendant, charging him with distribution of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). A superseding indictment was returned against Defendant on November 15, 1990 which, in addition to the cocaine offense, charged Defendant with possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g) and 924(e)(1).

Defendant has filed two motions to suppress evidence. Defendant seeks an order suppressing statements he made after his arrest and also an order suppressing physical evidence seized from his residence. The Court finds no basis to suppress the evidence and thus will deny both motions.

Facts

The Court held an evidentiary hearing on Defendant's motions on December 14, 1990. For the purposes of Defendant's motions, the Court finds the following facts established by the preponderance of the evidence.

On the evening of October 17, 1990, agents of the Bureau of Intergovernmental Drug Enforcement Agency (BIDE) staged an undercover narcotics operation in Livermore Falls, Maine. Agent Michael Kelly led the BIDE team, which also included Agents Roger Landry, Richard Cloutier, two unidentified BIDE agents, and Agent Michael Buchanan of the United States Immigration and Naturalization service. Agent Richard Small, equipped with a hidden body transmitter, posed as a potential purchaser of cocaine.

The subject of the BIDE operation was Defendant Calvin L. Tidswell. Defendant has had prior exposure to the legal system, having previously been convicted of involuntary manslaughter and two other felony offenses. At the time of his arrest on October 17, Defendant resided in an apartment in Livermore Falls. The one-room,

loft-style apartment, situated in the second story of a barn, measured 12 feet by 20 feet and contained a full-sized bed, a sofa, a coffee table, an end table, a dresser and some shelves. Defendant's parents owned the structure containing the apartment and lived close by, though in a separate dwelling.

A confidential informant cooperating with BIDE introduced Agent Small to Defendant at Defendant's apartment. Also present in the apartment was Dale Dustin, an acquaintance of Defendant. After their introduction, Agent Small negotiated with Defendant for the purchase of ten ounces of cocaine. They agreed on a price and Defendant gave Small a bag containing ten ounces of a substance containing cocaine. Agent Small then purported to retrieve the money for the deal from his car. While outside, he spoke into the transmitter and indicated to the other BIDE agents, who were monitoring the events, that he was about to place Defendant under arrest. This was a prearranged signal for the other officers to enter the apartment as soon as Small returned inside.

Agent Small reentered the apartment at 6:45 p.m. and placed Defendant under arrest. Agents Landry, Kelly, Buchanan and Cloutier followed close behind, their weapons drawn, and entered the apartment less than a minute later. The agents handcuffed Defendant, the confidential informant and Dustin, and ordered them to lie on the floor of the apartment. Dustin and the confidential informant were then removed from the premises by Agent Cloutier, who turned them over to two of his officers. The agents holstered their weapons after the suspects were handcuffed.

When the scene in the apartment was secure, Agent Kelly went to the residence of Defendant's parents to explain to them what was happening. Agents Small, Landry, Buchanan and Cloutier remained behind with Defendant. Those agents spoke among themselves but not to Defendant. Agent Kelly returned to the apartment about ten minutes later.

At 6:54 p.m., Agent Small pointed out to the other agents a small bag containing a white, powder-like substance which the agents suspected was cocaine. Agent Small placed the bag on the coffee table. Agent Landry later on noted time the bag of cocaine was seized in a "crime scene investigation log" he recorded later that evening.

While on the floor, Defendant asked the agents what he could do to help himself. Agent Kelly told Defendant not to make any statements until his rights had been explained to him. The agents took the handcuffs off Defendant and seated him on the sofa. Immediately thereafter, at 7:09 p.m., Agent Cloutier informed Defendant of his rights as required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), reading from a small card issued by the Maine Attorney General's Office.[1] At 7:11 p.m., Defendant orally waived his rights and stated that he would talk to the agents.

Defendant was emotionally shaken immediately after his arrest, but calmed down relatively rapidly. At the time he waived his rights, he spoke clearly and appeared

---

**1.** The card from which Agent Cloutier read stated in pertinent part:

1. You have the absolute right to remain silent. Do you understand that? (Get a verbal response.)
2. Anything you say can and will be used against you in a court of law. Do you understand that? (Get a verbal response.)
3. You have the absolute right to the advice of a lawyer before any questioning and to the presence of a lawyer here with you during questioning. Do you understand that? (Get a verbal response.)
4. If you cannot afford a lawyer, one will be furnished to you free before any questioning, if you desire. Do you understand that? (Get a verbal response.)
5. If you decide to answer questions now, with or without a lawyer present, you have the right to stop answering at any time or to stop answering at any time until you can talk to a lawyer. Do you understand that? (Get a verbal response.)

Now, having all those rights which I just explained to you in mind, do you wish to answer questions at this time? (Get a verbal response.)

*See* Government's Hearing Exhibit 1M.

Defendant answered affirmatively to each of these questions.

rational and in control of his faculties, and the agents did not notice any signs that would indicate that he was intoxicated. The agents did not make any explicit threats or promises to Defendant to coerce the waiver of his rights. The Court finds that Defendant was not intoxicated at the time he waived his rights and that the waiver was not in any way induced by any alcohol he had consumed prior to the time of the waiver.

Immediately after Defendant's oral waiver of his rights, the agents told Defendant that they wanted to search the apartment and asked for his consent. Agent Landry filled out a "consent to search" form for Defendant to sign. At 7:12 p.m., the consent form was presented to Defendant. Agent Kelly assured himself that Defendant could read and understand English, and the consent form was read to Defendant by Agent Cloutier. Defendant read and signed the consent form a few minutes after 7:12 p.m.[2]

After Defendant signed the consent form, the agents conducted a search of the apartment and seized numerous items. Defendant aided the agents in their search. In response to Defendant's inquiries about how his cooperation would benefit him, Agent Kelly explained to him that he could give him no guarantees but that his cooperation could not hurt him. Kelly explained to Defendant, in general terms, the federal Sentencing Guideline system and told him that the sentencing judge was the only individual who could decide the weight to be given his cooperation in deciding his sentence.

During the search, Defendant directed the agents to, among other items, a bag containing cocaine in the pocket of a coat and a .22–calibre pistol. Agents Buchanan and Small conducted the search and Agent Landry recorded an inventory of items seized. The agents concluded the search at 7:42 p.m.

Agent Kelly interviewed Defendant at the apartment after Defendant had waived his *Miranda* rights. During the interview Defendant named other persons who were involved in cocaine trafficking. The interview ended at approximately 7:45 p.m. Defendant never asked to speak to an attorney or for the agents to stop their search or their questioning.

Defendant also agreed to help the agents apprehend Andre Lopez–Polanco, a Dominican national whom Defendant had named as a cocaine supplier. After Agent Kelly's interrogation, Defendant telephoned Lopez–Polanco to arrange a cocaine transaction. Lopez–Polanco arrived later that evening, with two other Dominican nationals, to deliver the cocaine. At Defendant's suggestion, Defendant and Agents Landry and Small sipped 12-ounce cans of beer when the Dominican nationals arrived to make the scene more convincing. The agents gave Defendant only one can of beer, and not until well after the prior interview and search had concluded. The agents did not give him any alcoholic beverages before he had waived his *Miranda* rights or before he had executed the consent to search form. The second undercover narcotics operation of the evening was successful and the three Dominican nationals were arrested.

Later in the evening, Defendant was transported to the Lewiston Police Department. There, at approximately 11:00 p.m., Agent John Paquette of the United States Department of Alcohol, Firearms and Tobacco interviewed Defendant. Agent Kelly

**2.** The "consent to search" form which Defendant read and signed reads in pertinent part:

I, *Calvin L. Tidswell,* have [been] requested to consent to a search of my *apartment* located at *RFD 2 Bx 2695.* I have also been advised of my constitutional rights to refuse such consent and to require that a search warrant be obtained prior to any search. I have further been advised that if I do consent to a search, any evidence found as a result of such search, can be seized and used against me in any court of law and that I may withdraw my consent to search at any time prior to the conclusion of the search.

After having been advised of my constitutional rights as stated above, I hereby voluntarily waive those rights and consent to a search and authorize *officers Roger Landry BIDE* and *Michael Kelly, BIDE, [and] Michael Buchanan* to conduct a complete search of the above described *apartment.*

*See* Government's Hearing Exhibit 2M.

had told Paquette that Defendant had been informed of and had waived his rights, and that he was cooperating with the authorities. Agent Paquette did not reread Defendant his *Miranda* rights, but he did tell Defendant that he did not have to answer his questions. Defendant responded to Paquette's questions. Defendant did not ask Paquette to stop his interrogation and did not ask to consult an attorney.

## I.

■ Defendant has moved to suppress the statements he made to the agents after he was arrested. He contends that the statements were not voluntarily made, and that he did not knowingly and intelligently waive his *Miranda* rights. He alleges that misconduct of the agents, including their alleged threatening conduct, false promises of assistance and provision of beer to him, require the suppression of any statements he made after his arrest.

Under *Miranda v. Arizona*, the government may not use statements of a defendant stemming from custodial interrogation unless it demonstrates the use of procedural safeguards effective to protect the defendant's Fifth Amendment privilege against self-incrimination. 384 U.S. at 444, 86 S.Ct. at 1612. The defendant must be informed "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.*

A defendant, however, "may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." *Id.* In determining whether a defendant has voluntarily relinquished his Fifth Amendment rights, the Court must examine "the totality of circumstances surrounding the interrogation." *United States v. Ferrer-Cruz*, 899 F.2d 135, 141 (1st Cir.1990) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979)); *see also North Carolina v. Butler*, 441 U.S. 369, 374–75, 99 S.Ct. 1755, 1757–58, 60 L.Ed.2d 286 (1979). The prosecution must prove by a preponderance of evidence that the defendant voluntarily and knowingly waived his rights. *See Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986).

There is no question here but that Defendant was in custody and was interrogated by the agents, and that Defendant's *Miranda* rights therefore attached. The Court finds that the agents adequately explained to Defendant his *Miranda* rights and that Defendant understood and affirmatively waived those rights before interrogation commenced.[3]

---

**3.** At the hearing on these motions to suppress, counsel for Defendant sought to establish that the agents' search of the apartment and their interrogation of Defendant commenced prior to Defendant's waiver of his *Miranda* rights and the execution of the consent to search form. Counsel questioned Agents Landry and Kelly about the crime scene evidence log recorded by Agent Landry. That log indicates that the "time started" was 6:54 p.m. and the "time ended" was 7:42 p.m. *See* Government's Hearing Exhibit 3M. Since the *Miranda* warnings and consent to search were not completed until after 7:09 p.m., Defendant argues that the search and interrogation must have commenced prior to the waiver of his rights.

Agent Landry testified that the "time started" notation refers to the time the bag of cocaine on the end table, a "plain view" item, was first seen by the agents. This testimony was credible and was consistent with every other witness's version of events. The Court finds, by a preponderance of the evidence, that the search and interrogation did not commence until after Defendant was given the *Miranda* warnings and had executed the consent to search.

On cross examination of Agent Kelly, counsel for Defendant sought to discredit this explanation of the 6:54 p.m. "time started" notation by pointing out that the plain view cocaine bag is the eighteenth item listed in the evidence log. Agent Kelly testified that Agent Landry could have filled out the evidence log in any way he saw fit. The Court sustained the government's objection to further questioning of Kelly with respect to the evidence log because Agent Landry, and not Kelly, had completed the log and because Landry was scheduled to appear as a witness at the hearing. Counsel did not follow up this line of questioning with Agent Landry.

The Court has weighed the apparent inconsistency in the evidence log against the uncontroverted and consistent testimony of the agents, each of whom testified that the interrogation of Defendant and the search of the apartment did not commence until after Defendant waived his rights. After that balancing, the Court concludes, by a preponderance of the evidence, that the search of the apartment and interrogation of

The remaining issue is whether Defendant's waiver of his *Miranda* rights was voluntary and knowing. After examining the totality of the circumstances, the Court concludes that the government has carried its burden of showing that the waiver was valid. Before any questioning began and before his rights were read to him, Defendant indicated his willingness to cooperate with the agents by asking, "What can I do to help myself?" For a person in Defendant's position, having just sold ten ounces of cocaine to an undercover police officer, cooperation with the authorities was an inherently reasonable course of conduct. Defendant appeared rational and in control of his faculties, displayed no signs of confusion or other mental impairment, and indicated that he understood and waived his rights. Moreover, Defendant is undoubtedly familiar with the law enforcement machinery, as he previously has been arrested and convicted for three serious crimes.

Most important, the Court finds that the agents did not engage in any coercive or overreaching conduct, express or implied, that would vitiate Defendant's waiver. Defendant was restrained for a short time, approximately twenty minutes, while the agents secured the area and the team lead-er, Agent Kelly, informed Defendant's parents of what was transpiring next door. During that time the other agents did not speak to Defendant and had holstered their weapons, and the atmosphere in the apartment was calm.[4] The agents did not make any threats or false promises and, contrary to Defendant's contentions, did not provide Defendant with any alcoholic beverages and did not hold out beer as an incentive to his cooperation. Viewing the totality of the circumstances, the Court finds that Defendant's waiver of his Fifth Amendment rights was voluntary, knowing, and intentional, and thus the Court finds no basis to suppress his statements.[5]

## II.

Defendant also moves to suppress the items seized from his apartment on the night of his arrest. Defendant contends that the search was executed without a warrant and that Defendant's consent to the search was involuntary and unknowing.

For an accused's consent to a warrantless search to be valid under the Fourth and Fourteenth Amendments to the United States Constitution, the consent must have been freely given and not the result of duress or coercion, either express or im-

---

Defendant did not commence until after Defendant had been informed of and had waived his *Miranda* rights and the consent to search form had been executed.

4. Defendant's apartment was relatively small. In some circumstances, the presence of numerous armed police officers in a confined space could constitute implied coercion and duress that would negate a defendant's waiver of rights. The Court finds that the circumstances in this case do not justify such a conclusion. After Defendant was restrained, the agents holstered their weapons and did not speak to Defendant. Agent Kelly left the scene to talk to Defendant's parents, and Agent Cloutier exited the apartment, taking the confidential informant and Dustin with him. Three agents (Buchanan, Small, and Landry) were left with Defendant, and Agent Cloutier soon returned. One or two other agents may have wandered in and out prior to Defendant's waiver of his rights and consent to search. The atmosphere in the apartment was calm, however, and the agents engaged in small talk among themselves. When Agent Kelly returned shortly before 7:09 p.m., the handcuffs were removed from Defendant and he was seated on the sofa. Agent Cloutier sat on the sofa beside him as he read the *Miranda* warnings and the consent to search form. After examining the totality of the circumstances, the Court finds no express or implied coercion or duress.

5. Defendant contends that his statements to Agent Paquette at the Lewiston Police Department must be suppressed, arguing that Paquette did not reassert the *Miranda* warnings. The Court finds no basis to suppress those statements. Agent Kelly told Paquette that Defendant had been informed of his *Miranda* rights, that he had waived those rights, and that he was cooperating with the authorities. Paquette interviewed Defendant less than four hours after Defendant had waived his *Miranda* rights. Paquette told Defendant that he did not have to answer any of his questions, although Paquette did not specify that he was inquiring about possible firearms violations. Defendant cooperated with Paquette and did not ask to speak to a lawyer or to stop the interrogation. Viewing all the circumstances, *see United States v. Nordling,* 804 F.2d 1466, 1471 (9th Cir.1986), the Court concludes that Defendant's statements to Agent Paquette need not be suppressed due to the lack of a second *Miranda* warning.

plied. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 228, 93 S.Ct. 2041, 2047, 2048, 36 L.Ed.2d 854 (1973). Voluntariness is a question of fact that must be determined by scrutinizing "the totality of all the circumstances" and only after a "careful sifting of the unique facts and circumstances of each case." *Id.* at 227, 233, 249, 93 S.Ct. at 2048, 2050, 2059. Among the factors to be considered in examining the voluntariness of consent to a search "are the consenting party's knowledge of the right to refuse consent; the consenting party's possibly vulnerable subjective state; and evidence of inherently coercive tactics, either in the nature of police questioning or in the environment in which the questioning took place." *United States v. Twomey,* 884 F.2d 46, 51 (1st Cir.1989) (citations omitted). Moreover, the following factors tend to demonstrate that consent given by a suspect is voluntary: the fact that a suspect has been given the *Miranda* warnings; that a suspect has been informed of his right to refuse entry without a warrant; and that a suspect has a criminal history. *See United States v. Kimball,* 741 F.2d 471, 474 (1st Cir.1984).[6] The prosecution bears the burden to prove that the accused freely and voluntarily gave his consent to the search. *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968).

Defendant's challenge to the voluntariness of his consent to the search rests on substantially the same grounds as his challenge to the adequacy of his waiver of Fifth Amendment rights. The Court has already found that Defendant's waiver of his *Miranda* rights was voluntary in all respects, and similarly, the Court concludes that Defendant voluntarily consented to the search of his apartment. Indeed, Defendant assisted the agents in their search,

pointing out to them various items of contraband. Moreover, the agents gave Defendant the *Miranda* warnings before he consented to the search, the agents explained to Defendant that he could refuse to give his consent, Defendant executed a written consent to the search which he read and which was read to him, and Defendant has an extensive criminal history. These factors demonstrate that Defendant's consent was voluntary and not the result of duress or coercion. *See United States v. Kimball,* 741 F.2d at 474. Furthermore, the Court has found that the agents did not employ inherently coercive tactics on the night of Defendant's arrest. After careful scrutiny of the totality of the circumstances, the Court finds, by a preponderance of the evidence, that Defendant's consent to the search of his apartment was voluntarily given and was free from police coercion, duress or overreaching, either express or implied.

### III.

The Fourth Amendment to the United States Constitution "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." *Payton v. New York,* 445 U.S. 573, 576, 100 S.Ct. 1371, 1375, 63 L.Ed.2d 639 (1980); *see also United States v. Beltran,* 917 F.2d 641 (1st Cir.1990). Defendant claims that the BIDE agents violated the Fourth Amendment in effecting his arrest. He contends that the arrest was invalid because the agents had not obtained a warrant for his arrest or for a search of his apartment, and there were no exigent circumstances justifying the warrantless entry and arrest.[7]

---

**6.** In addition, the fact that a suspect is in custody calls for special scrutiny. The Court in *Schneckloth* was careful to narrow its holding to situations where the consenting party is not in police custody. *See* 412 U.S. at 248, 93 S.Ct. at 2058. The Court noted, however, that "other courts have been particularly sensitive to the heightened possibilities for coercion when the 'consent' to a search was given by a person in custody." 412 U.S. at 240 n. 29, 93 S.Ct. at 2055 n. 29 (citations omitted). *See also United States*

*v. Kimball,* 741 F.2d at 743 (the fact that defendant was in custody at time he consented to search was a relevant factor in the district court's determination of the voluntariness of consent).

**7.** It is beyond dispute that the agents had probable cause to believe that Defendant had committed a crime and that Defendant was in the apartment.

■ Defendant's argument fails because he consented to Agent Small's entry into his residence. "[B]y extending such an invitation, [Defendant] voluntarily exposed [himself] to a warrantless arrest." *United States v. Ruiz–Altschiller*, 694 F.2d 1104, 1107 (8th Cir.1982); *see also Lewis v. United States*, 385 U.S. 206, 211, 87 S.Ct. 424, 427, 17 L.Ed.2d 312 (1966); *United States v. Paul*, 808 F.2d 645 (7th Cir.1986). After Agent Small made the valid arrest, the backup agents entered the apartment to secure the area while waiting to obtain a search warrant. As it turned out, Defendant voluntarily consented to the agent's search of his apartment, obviating the need for a search warrant. The Court finds no constitutional violation with respect to Defendant's arrest and thus no basis to grant Defendant's motions to suppress evidence.

Accordingly, it is ORDERED that Defendant's Motion to Suppress Statement be, and it is hereby, DENIED; it is also ORDERED that Defendant's Motion to Suppress Physical Evidence be, and it is hereby, DENIED.